Bentley, J.
(Orally).
This case of John Shannon v. The Columbus, Hocking Valley & Toledo Ry. Co., finally proceeded to trial upon the amended petition of the plaintiff, which had been filed in the case, and the pleadings subsequent thereto. Prior to the making up of the isaues of fact, a demurrer had been interposed to the amended petition. It was a general demurrer in its form, and called in question the petition — as to whether it stated facts sufficient to constitute a cause of action in favor of the plaintiff against the defendant. The point made against it, in argument, if I apprehend it, is this: The petition alleges that the injury occurred to the plaintiff below on account of certain defective machinery which had been furnished by the defendant railway company, and which it was the duty of the defendant in error to work around, or about, and the par *451 .ticular defect in the machinery is set out in this amended petition, and an averment of negligence is made against the-company; and the statement is also made that the defects ia question were unknown to the plaintiff below, who was without negligence in the matter; but the petition failed to state this: that the plaintiff could not, by the exercise of reasonable care and attention, have discovered these defects and this danger prior to his injury. It is claimed by the defendant company, that it was necessaay for him in his petition to make that statement substantially, and the case of the Mad River & Lake Erie Railroad Company v. Anson C. Barber, 5 Ohio St. 531, is mainly cited to support that proposition, and is a case more especially applicable than any that our attention has been directed to, or that we have knowledge of. The part of the syllabus in that case which bears upon this matter, is as follows:
“ The conductor of a train of railway cars, being the representative of the railway company in the command and management of the train, and not being under the immediate control and direction of a superior or supervisory agent, is held to ordinary and reasonable care and diligence, not only in the management of the train, but also in the due inspection of the cars, machinery and apparatus of the train, as to their sufficiency and safety; and if he receive an injury while neglecting that care and diligence required of him in the-management of his train, or by means of any defect or insufficiency of the cars, machinery or apparatus, with a knowledge of which he was running the train, or which could have been known to him, by the exercise of that care and diligence required of him in the performance of his duty; or, in other words, if his neglect in either of these particulars contributed as a proximate cause of the injury, he can have no right of action against the company for damages.”
And again:
“ In such action, the plaintiff, in order to lay a sufficient foundation for a recovery and judgment, for. an injury received by him while acting as such conductor, must, aver, or show in his petition, in addition to the allegation that h§ had not a knowledge of the insufficiency or defects which were *452 the alleged cause of the injury, that he had exercised due care and diligence in the use and examination ór inspection of the cars, machinery, etc., belonging to the train, while the same were in his charge, and under his direction.”
In such a case, the Supreme Court held the plaintiff must state in his petition that he was not guilty of negligence in failing to use reasonable care and diligence in his inspection of the cars and machinery prior to the accident. And the question is, whether this case is so similar to that, that that rule would apply to this. It will be observed that the Supreme Court, in pronouncing that opinion, took great pains, at considerable length, to define the duties of the conductor of the train, his position, and what is naturally expected of him; that is, that he is not under the immediate control of any other agent of the company ; that, in that particular, he at that time is the sole representative of the company, which must act through its agents — and being chargeable with the duty himself to see to these things in the particulars of which he complains, it is held reasonable that in his petition by which he commences his action, he should show upon the face of that that he had not neglected those duties which were inqumbent upon him by reason of his very position.
In the case at bar, this is a part of the petition : “ Plaintiff further says that the said derricks, engines and machinery, and the engineer in charge of the same, were entirely under the control and direction of a foreman in the employ of said defendant.”
“ Plaintiff further says that at and prior to the said date he was employed by the said defendant in the work of transferring the coal from cars or from said dock to vessels lying alongside thereof. The plaintiff directed the loading of the buckets with which the said derricks were equipped as aforesaid, the adjustment of the vessels to receive the coal, and the unloading of the buckets after they had been swung by the arm of the derrick over the deck, and lowered to the hatch of the vessels.”
It would seem by these averments, if they are proven — - that the position of the plaintiff below in this case is not analogous to the position of the conductor on a train of cars. *453 In the case in 5th Ohio St., there was nothing in the petition, to indicate, that he was subjected to any other duties than those which are imposed upon an ordinary conductor of a train of cars. It appeared by the petition then what his duty in that regard was, and that he was the sole representative of the defendant company in that case. Here, the direct averment is that these derricks and engines, and the engineer in charge of the same, were entirely under the control and direction of another person, in the employ of said defendant, and he says that instead of his operating the derricks, buckets, etc., his duties were simply to unload — to see that the buckets were loaded and unloaded, and that the decks of the vessals were adjusted to receive the coal from the buckets; so that we are unable to see that from the averments of the petition itself, he was a representative of the •company, charged with the duty himself of inspecting this machinery, and charged with notice and knowledge of such defects that existed in it as might be seen by ordinary '’observation, or discovered with ordinary diligence in that regard.
It is said, in analogy to the principle involved here, that in a case of personal injury, if it appears from the plaintiff’s own testimony that he may have been guilty of negligence, it is his duty under such circumstances to;himself take the burden of disproving that negligence, the suggestion of which arises from the testimony which he himself presents. In the one case, his duty arises from the state of the testimony, and in the other case, from the statements of the petition itself; but I think it is nowhere held that it is his duty — in the absence of any suggestion arising from his own testimony, or that offered by him, that he may have been guilty of contributory negligence — that he should assume the burden of disproving affirmatively any negligence on his part.
We conclude, therefore, that the demurrer to this petition was properly overruled, and that the plaintiff in his petition states facts sufficient to constitute a causejof action against the defendant for the alleged negligence.
It is further objected on the park of the plaintiff in error here that “said court erred in overruling the motion of the *454 plaintiff in error for a new trial; that the court erred in its charge to the jury; that the court erred in the admission of evidence objected to by the plaintiff in error; that the court erred in ruling out evidence offered by said plaintiff in error; that said judgment was given for John Shannon, when it should have been given for said plaintiff in error, and other errors manifest upon the face of said record.”
This record has been carefully gone over by us. We have-considered all that could be properly alleged in favor of the-plaintiff in error, or otherwise, in it, and by careful inspection of it, we have been unable to find any point in the trial where-the court erred in the admission of evidence, or in the rejection of evidence, in such manner as to work prejudice to the plaintiff in error here. v
The main questions arising, after disposition of the demurrer, would seem to be those arising from the overruling of the-motion for a new trial, based in part upon the insufficiency of the evidence, and the alleged erroneous charge of the court in the case.
It appears by the record that nearly all of the propositions which would naturally arise in the case to be given by the court to the jury, were formulated by the defendant below — by his counsel — and were given to the jury by the court. They were read after the court had himself charged the jury to some extent, and directed their attention generally to the questions that arose in the case.
That part of the charge which is considered in argument and excepted to strenuously, is towards the latter part of it, where the court seems to sum up, as it is claimed, the general principles that he had given theretofore. The court said to the jury:
“To be a little more specific in reference to this, let me say to you that you must find, before you can return a verdict for the plaintiffs :
“First — That there was defective machinery, as charged.
“Second — That the defendant knew that it was.defective, or should have known it.
“Third — That the plaintiff did not know of the defective machinery; or, if he knew of its defects, he did not know of he danger.
*455 “Fourth — That the defects caused the plaintiff’s injury.”
This charge is strenuously objected to, and mainly for the reason of this sentence, occurring in the third subdivision' of the summing up: “ Or, if he knew of its defects, he did not know of the danger.” In determining how far that was prejudicial, or how far that might mislead the jury, or whether it was in fact erroneous, it is incumbent upon us to look to the whole charge in the case. This fifth proposition, among others — and there were quite a number bearing upon the same point — was requested to be given by the defendant below, and was given in this language, by the court:
“Fifth — In order to recover in this action, the plaintiff must prove to the satisfaction of the jury, that the machinery or appliance complained of as causing the injury, was, at the time of such injury, in an unsafe and unfit condition to be used for the purposes for which it was used and intended;. that the defendant knew this, or, by the exercise of ordinary care, might have known it; and that the plaintiff did not know it, and could not have known it by using ordinary care and observation in the discharge of his duties.”
And again, following that :
“Sixth — If the machinery or appliance complained of as causing the injury to the plaintiff, was unfit, or in an unsafe condition, and such unfitness or unsafe condition was latent or hidden, so that it could not be known to the defendant by the exercise of ordinary care and diligence, it cannot be held guilty of negligence in allowing its servants to use the same ; and if the jury find that the machinery or appliance was unsafe for use in any respect, there can be no recovery in this action unless the jury also find that the defendant, by exercising ordinary care and diligence, could have known of such unfit or unsafe condition of the machinery and appliance.”
There are various other parts of the charge among the requests given which bear upon this proposition. It seems then, that during the trial, in the language prepared by defendant’s counsel, this proposition which the company claim should have been given to the jury, was given to the jury several times over, and the question is — whether, by the court’s hurried summing up at somewhere near the close of his charge, *456 he did away with the effects of his former charges in the minds of the jury, by the clause : “Or, if he knew of its defects, he did not know of the danger.”
The real question, as it seems to us, is not simply whether there was a defect in the machinery — a mere defect in the machinery would have been of no special moment — but the question was, whether the machinery, by reason of its defective condition, was unfit to be used and unsafe for the parties that should be working in its vicinity. The charges framed by the defendant company below embodied this idea. It is not if the conspany knew of a defect in the machinery, or whether the defendant in error here — the plaintiff below — could, by the exercise of reasonable diligence, have discovered a defect, or the defect in the machinery : that was not the proposition ; but whether the machinery was in an unsafe condition, and whether the plaintiff below could, by the use of reasonable diligence, have discovered that unsafe condition of the machinery. Now, we think that by the charge of the court, given as requested, together with this which is complained of, the jurors’ minds were not necessarily or probably misled as to the real propositions in the case. The question was, whether this defect in the machinery was so dangerous in its character that this might have been discovered by the exercise of reasonable diligence.
There, is authority for the proposition alluded to here, in what is called the Fitzpatrick case, 31 Ohio St. 479, which has been cited in argument. In that case it appeared that the plaintiff knew of the physical state of things. He was attending the crank which turned the turntable on which engines were to be turned, and he knew of certain changes in the size of the engines and in the adjustment of the machinery there; he knew, in fact, that an engine standing upon the turntable would project beyond it over the track, so that when another engine came down the track, with his engine standing in that form, the engine standing upon the turntable would be hit by the other engine; and yet it appeared, by his testimony in the case, that while he knew that particular thing, he did not know that if that sort of an accident did occur, the turntable would give way to the force of the engine upon the track, *457 and that that would reverse the crank that he was attending to, so that an injury might be apprehended by him ; and the court in this case say : that although he knew of this defect,— if you might call it so, — he was not necessarily chargeable thereby with knowledge that that would cause an injury to him. The court in this case might have elaborated a little more upon this, and have explained to the jury what he intended by the statement: “ If he didn’t know of the danger; ” but we are unable to find, in view of the whole charge, that the jury were misled into a wrong idea of the proper rule upon this subject by this charge, and therefore we are constrained to find that the court did not err in this particular in its charge.
Another question is presented to be disposed of, and that is, whether the court erred in overruling the motion of the defendant below for a new trial. This presents the question whether or not this verdict was sustained by the evidence offered and received in the casé. As to that matter, we have carefully considered all of the testimony — read it.
It seems patent in the case that, in some way or other, this heavy bucket, suspended to the arm of this crane, was allowed to drop, when the plaintiff below was under it, and that that caused his injury. The question pre-ented to the jury was: what caused that bucket to drop — -what allowed it to drop, — and whether that cause was something that was attributable to the negligence of the plaintiff. It is said that it is mere theory as to what caused it to drop; but the jury, of course, were entitled to draw any inference that naturally and reasonably arose from the testimony that was presented to them.
It is unquestioned that the bucket, being heavy, was suspended in mid air by the force of friction of a wheel in the derrick against the friction block, as it was called ; that that had been before that time sufficient to hold the bucket in mid air, when the lever was properly adjusted; that nothing of this nature had ever happened before, and that that was the way the machine was constructed, viz., that the bucket should be retained safely in mid air, upon proper occasions, by the friction of this wheel pressed with force against the friction- *458 block. The contrivance by which this was done is not a complicated contrivance; it seems that any person with the ordinary apprehension of mechanical principles, could understand how the machine worked. The machine was arranged in such a way that the lever, when pressed forward, would pi-ess this wheel against the friction-block, and the original design of the maker of the machine is plainly indicated that it should be held in place — sometimes, at least — by the pawl, or dog, attached to the lever fitting into the slot in a quadrant prepared to receive it. It seems plain, from the testimony, that, on the occasion in question, this part of the machine was not used for that purpose; but it is said that, it being out of repair, it was not used for that purpose, and had not been for a long time, and that it bad been found, up to that time, unnecessary, and that when the lever was thrown forward far enough, the machine was so constructed otherwise, that the bucket would be suspended in mid air safely.
This model of the machine was used in explaining the testimony to some extent, although it appeared, from the testimony, that it was by no means a perfect model. To illustrate the meaning of witnesses, it was used, and it affords some aid to the court in determining what the real question was. When this lever (in model) was pressed forward, it seems that this wheel, being pressed against the friction-block, held this rope tight enough to sustain this bucket in mid air, and the bucket only descended — unless the bail broke, or the rope should break — when this wheel should turn. This shaft, or cylinder, turned in order to let the bucket rise or fall in the doing of the business designed.
The jury would be fairly warranted in inferring from the testimony that., as this bail did not break — that as this rope did not break — the bucket was lowered by reason of this cylinder turning; that the friction became insufficient between this wheel and the friction-block, to keep this cylinder from turning, and that it did turn and the bucket went down-
There is testimony on both sides of the question whether or not if this ratchet, this dog and slot, had been in proper condition and had been properly used, it would have accomplished the'purpose of keeping this wheel so against the friction-block *459 that it would not turn. Quite a number of witnesses testified that it would not, owing to the wearing of this friction-block, and that continuous re-adjustment would be necessary; that that was impracticable, and that if was not in fact used for that purpose, and it was claimed that whenever the engineer stood by, with his hand upon the lever, he could control the movements of this cylinder, and undoubtedly, from the testimony, he could have done so. But, we think, that the jury were warranted in inferring that the original design in this machine was that this friction should be kept up when no person was holding this lever, by means of this pawl and slot; that it was sufficient for that purpose when the machinery was in good order, and although it had appeared that for some time that was unnecessary; that the weight of this drum or that the action of the cam — as it is called — at the end of this lever here, was sufficient to cause friction enough to hold this; yet the jury were to determine whether or not, under the circumstances, the defendant had a right to rely upon the machine working without this part of it being in order. The jury had before it this fact: that when the bucket went down, it had, instead of its being empty, perhaps a hundred pounds of coal, or some amount'of-coal in it, and that when it started down, it did not fal-1 at once, suddenly, as if something had given way about the machinery, but it started slowly and continued to descend with perhaps increased rapidity, until it struck the plaintiff below, and caused the injury. From that fact it seemed to be a natural inference that the force holding the rope was, up to that time, sufficient to suspend the weight of the rope and the bucket, .and that when it gave way at first, it was almost upon a poise, .as it did almost sustain it, but not quite; and possibly it might be that while it would have sustained the empty bucket — and had sustained the empty bucket up to that time — that the additional weight of the coal might have been just sufficient to overcome the resistence sufficient to allow the bucket to descend. Well, now, if this appliance, without the aid of this pawl, this ratchet and this slot, was just sufficient to sustain that bucket in mid air by the friction of the wheel and the friction-block, the question would arise whether the *460 defendant, without using the appliances which had been prepared' for that, could rely upon that nice poise between the weight of the bucket and the friction between the wheel and the block? We are inclined to think that upon that point the jury would be warranted in coming to the conclusion that the defendant had no right to rely upon that always being sufficient — upon that poise always being maintained. It is said that this would not accomplish the purpose any way, but it seems inferable from the testimony that, by some care at least in adjusting the length of this rod with which this appliance was provided, the adjustment from time to time might have been made so that the wheel would be held to the friction-block sufficiently by the action of this pawl and ratchet. It was testified, by some witnesses, that that had been used and that it was effective, quite a length of time prior to the accident in question, and it was further apparent from the testimony that, in some way or other, this spring— by use, or in some way^ — -had become worn out — as some witnesses expressed it; that the pawl which entered into the ratchet, had become worn and rounded so that it would not fit; that the ratchet itself had become worn so that it would not firmly hold the dog in position, any way, and that it had been filled up more or less by dirt and grease, indicating that it had not been used for a long time.
We think, the jury might take those things into consideration and that they might in fact infer from that, that at some time or other this appliance had been used, and that it had been used sufficiently for the purposes for which it was designed to have become thus worn and rounded and ineffective, and that at some time or other it had been found to be a necessary part of the working parts of the machinery.
It is said that this defect might have been discovered by the plaintiff below, and that testimony was given indicating that he had been in there and around there, and probably had • notice of it. He says himself, point blank, that since this machine had been repaired, in the spring, he had never been .in there. There is no testimony showing with any degree of certainty that he had been in there, staying any such length of time as would warrant the conclusion that he would prob *461 ably have observed the different parts of this machinery. There is some testimony tending to show that he had been in there, but that his attention had been called to this machinery, or that he was in there under such circumstances that he would probably have noticed it, does not appear at all, and, we think, that as to that matter the question was fairly before the jury as to whether or not he was chargeable with knowledge of this defect.
But it is said that he could have observed this bucket, in mid air, and that he ought to have seen it — ought not to have gotten under it,and that in failing to observe and in getting under he was guilty of such contributory negligence that he could not recover any way. The charge of the court to the jury in that regard was quite strong. Among other requests of the counsel for the railroad company, the court charged:
“ 12. It was the duty of the plaintiff to use ordinary care and prudence to look out for and avoid danger from the derrick and'coal-bucket suspended thereon; and if, by using such care, he could have seen or known of the suspended bucket as he approached the same on the vessel, in time to have gotten from under it and avoided being struck by the bucket as it descended, he was guilty of such contributory negligence as-will defeat a recovery in this action.”
, And there are other similar propositions given in charge to the jury. We think that in this charge to the jury the court went to the utmost verge of the law in favor of the defendant company. We think that really, under the circumstances, it was a question to be left for solution by the jury whether or not, under the circumstances in which he was placed, Mr. Shannon was absolutely under the duty of looking up at that bucket suspended over the deck, and if a charge in that regard had been given to the jury, they would have been free to have found whether or not, under the circumstances that he was placed in, it was his duty to have absolutely looked to see whether or not he was under the bucket, and although, possibly — construing this charge in one way — the verdict of the jury in that regard may not have been warranted by the testimony, yet we think that the verdict would have been *462 warranted under such a charge as should have been addressed to the jury in this regard, and that the plaintiff in error has no ground for complaint in that particular. As a matter of law, we can not say that he was bound to keep out from under that bucket, or that, even if it was physically in his power to have seen it, it was his absolute duty to have seen it and kept out from under it. He was engaged in other duties at that time. It was entirely a different case, we think, from a case where a man in driving along a country road comes to a railroad track where trains are passing frequently, as to the duty to look out for danger and to stop, etc. In this case he was engaged in the duty of placing the vessel — a large structure, and it had to be placed in just such a position. It was not a matter of the utmost ease to do that. His attention naturally would have to be directed to that with some degree of intensity. He had to place his vessel so that the small hatch-wav should be directly beneath this bucket, and now, if in attending to that duty and more or less absorbed in it, he failed to look and observe whether or not he came under that bucket, we think it can not be said as a matter of law, or that the natural and proper inference arising from that set of circumstances is that he should have looked and kept out from under the bucket. We think that the jury were abundantly warranted in this case in finding that the defendant company was guilty of negligence in the regards mentioned in the petition, and we think they were warranted in coming to the conclusion that the plaintiff below was not chargeable with contributory negligence by which his injury occurred, and that they were warranted from the testimony in finding a verdict in favor of the plaintiff and against the defendant.
The jury found a verdict of $30,000, an unusual verdict, and perhaps an unprecedented verdict, it is claimed, an unprecedented verdict in Ohio, in a case of this kind, and it must be confessed that it is beyond the ordinary scope of verdicts of this kind. It is $20,000 more than could have been by law recovered in this state, in case it was an action for causing death by a wrongful act. If a man had been killed, and his representatives had brought an action, $10,000 would have been the limit that they could have recovered.
*463 Of course there are in this case elements of damage to be taken into consideration that would not be taken into consideration in a case of that kind — the causing of death by a wrongful act; but it is strenuously argued that this verdict is excessive in amount. While, in these cases, there are some rules to be applied, it is not a matter of such absolute calculation as that it is possible to sáy at just what sum the testimony will place the amount of the verdict, if one is to be rendered. The jury had before it, in determining the amount of the verdict, the amount of the income or the earnings of Mr. Shannon, and the testimony as to his expenses growing out of this injury, his sufferings, etc. They had the testimony that he was working by the month. It appears from the testimony that he was earning, as to the money compensation, $75 a month ; that he had the rent of the house free — possibly two houses, — and he calls it, himself, $110 a month. There is no testimony, I believe, as to what the fair rental of those houses was, except as we may infer that Mr. Shannon claimed that the rent was the difference between the $75 a month and the $110 per month, which he said was his pay from the railroad company. The testimony also, bearing upon his income, was that he kept two horses upon the dock, and that he received certain pay for .that. It is to be remarked in this connection that the expense of keeping those horses — who did keep them — whether they had a driver furnished by him at the price he says he got for the use of the horses, does not appear, so that any net income he got for the use of the horses is not clearly disclosed by the testimony. There was also testimony as to his having an income from the keeping of boarders ; that that income varied very much at different seasons of the year, and there were other circumstances that controlled it. Sometimes the net was as much as $50 a month, and sometimes it was run at a loss, but, on the whole, it was claimed that an income during the year was derived from it; but the amount of it is uncertain, and, beyond that, we think the proof fairly discloses that that was a matter attended to by the wife — she attendéd to all that part of the business and collected the money. It is said Mr. Shannon also had some kind of an arrangement with a Cleveland firm by which he was enabled *464 to earn sometimes $80 per month and sometimes $20 per month, but that did not operate during the whole year, but only occasionally, as he had work to do, perhaps, during nine months of the year. Just what that contract was, how extensive it was, how long it should continue, the evidence does not disclose. In fact, we are inclined to think, from the testimony, that the real income of the plaintiff below, Mr. Shannon, which ought to be considered by the jury as having been cut off by this injury attributable to the plaintiff in error, was $110 per month, or in that neighborhood, which would make something over $1300 a year.
Thirty thousand dollars, at the rate of interest usually and generally obtainable now, in many parts of the state, at eight per cent, would be $2,400; at six per cent, it would be $1,800; so that $30,000 awarded by the jury, at simple interest, would yield every year, for all time, you may say, $1,800 a year — a sum far in excess of the income of Mr. Shannon, which might be considered as being cut off by this injury. And not only would this sum produce a larger sum, annually, by a good many hundred dollars, than the income, but at all times the principal would still be there and intact. Of course, this is leaving out of view for the moment the damages arising from the expenses and on account of the sufferings of Mr. Shannon growing out of the injury. It is said that a fair rule in such cases, so far as the income is concerned, is: such an amount as would procure an annuity equal to the income. Looking at the tables prepared for that purpose, it would seem by the figures that about $15,700 would purchase what is called an annuity at six per cent, for $1,310 — considering the age of Mr. Shannon — being about forty years. Thirty thousand dollars, of course, would procure an annuity very much larger than this, so that in order to purchase an annuity of $1,310 a year, about $15,700 would be necessary, and that would leave — if that is a correct basis upon which to proceed, or a substantially correct basis, the difference between $15,700 and $30,000, for the expenses — which were about $1,200 — and for the damages, suffering, etc., caused by the injury.
James Wilcox, and Doyle, Scott & Lewis, for plaintiff in error.
Scribner & Hurd, for defendant in error.
Of course, it may be said that in any one of these cases, it is impossible to mete out, in dollars, and cents, an equivalent for human suffering; but it has to be done. The juries are sworn to do just that thing — to make compensation — to award such an amount as will compensate the plaintiff for his expenses and his physical and mental suffering growing out of an injury of this kind; it is a matter of judgment; the law contemplates it may be done, and verdicts are rendered upon that basis. We are not unmindful of the length of time that Hr. Shannon suffered from this injury; of the excruciating tortures that he suffered, but, after all, in considering the rules to be applied, there must be a limit somewhere to the amount that should be awarded against the defendant to compensate him for such injury and such suffering. We must take into consideration, to some extent, what is usually meted out to persons suffering such injuries. This, we think, is far in excess of the usual amount which is awarded in similar cases, and, considering it in all the lights in which it might be held up, we are forced to the conclusion that, after all, this verdict must be deemed excessive — that it is too much; that calmly and dispassionately looking at all the evidence, and considering the rights of the parties to the case, the verdict of $80,000 is not sustained by the evidence. We think that if the verdict had been ten thousand dollars less than that — if it were a verdict for $20,000, that would compensate for loss of income and compensate for the suffering, etc., so far as it can be legitimately done by any amount of money — would have, in the eye of the law, compensated the plaintiff for the damages that resulted from this injury.
We have, therefore, concluded, that if the defendant in error, or his representatives, see fit to remit from this judgment the sum of $10,000, the verdict may stand for the $20,000; otherwise, we should be constrained to order, as required by our finding, that the verdict is not sustained by the evidence given to the jury.